Geo Geovanni Sorry, it's waiting on the live stream. Thank you for your patience, your honors, the live stream has now started to the public and we're ready to begin, Ms. Gaddis. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and his Honorable Court. Good morning and welcome to the 11th Circuit. Today we have three cases up for oral argument. As you know, we have a timing system in this court, but generally we use light and obviously you can't see any lights over the telephone, so our courtroom sessions deputy, Ms. Gaddis, will be alerting you as to when you have two minutes left of your argument time and when your time has expired. Please stick to the limit, except to the extent that we ask you questions that bring you over the time limit. We do want you to answer those questions or else you wouldn't ask them. Alright, thank you for paying attention to the time limit and we will begin with United States Attorney General, Mr. Gio Giovanni. We'll hear first from Ms. Yard. Good morning. May it please the Court. My name is Michelle Yard and I represent Gio Giovanni. I'm going to begin with the loss calculation. Beginning long before sentencing, Mr. Giovanni objected to the government's calculation of the loss. He did so in his motion to continue, his PSR objection to sentencing memo and at the sentencing hearing. He repeatedly articulated that he objected to the factual accuracy of the amounts in the PSR and that he was putting the government to its burden to prove the loss calculation with reliable and scientific, specific evidence. Counsel, this is Robert Love. I'm not going to tell you what to argue and feel free to argue the loss calculation issue, but I am much more interested in hearing about your argument on the sufficiency of the evidence both with regard to the conspiracy count and as to the aiding and abetting the bank fraud count. Yes, Your Honor. Thank you. My argument on the quote-on-motion for a new trial is that the court erred in failing to grant it due to the insufficiency of the evidence during that trial. The essential crux in a conspiracy case is that the government has to prove a meeting of the minds to commit an unlawful act that's been charged. Here the government failed to prove that. While the government can meet its burden through circumstantial evidence, and this was completely a circumstantial evidence case, that still has to be based upon reasonable inferences from the conduct. The government cannot prove a conspiracy based on speculation or by proving that the defendant just associated with a bad person. And essentially what the government proved here was that Mr. Giovanni did associate with a bad person. He associated with the immunized cooperating co-conspirator number one, Tina Karahito. The government proved... Counselor? Yes. Counselor, I'm sorry. This is Robin Rosenbaum. I have a few factual questions that I wonder if you might be able to help me out with. My first question is concerning the incentive payments, and I understand how they were advertised. I also noticed that the amounts that were actually paid for the down payments didn't match what the incentive payments would have been. But I understand that that was done because the buyer could elect to take their payments up front instead. But what I'm wondering is, is there any evidence in the record concerning whether the rest of the incentive payments were made to the buyers or whether any incentive payments were made to the buyers after the payments of the down payments?  There's no evidence of that in the record. Okay. So we don't know one way or the other. Correct. Okay. My second question to you concerns an email on June 23, 2008, from Mr. Giovanni to Ms. Karahito in which he says at one point, there's enough of a spread for you to be able to collect a fee for your health. What is the spread that he is talking about? So if I recall, that email is in reference to him talking about bringing in additional people and that he's talking about if they do work with these other people, that there would still be enough money coming in to where Ms. Karahito would still get her cut even if they added additional people in on this project to work with. Great. But what is the spread between? Like, I understand there's enough money, but where is that money coming from? I mean, what is the difference? What is... How is the profit made up, I guess, should I say? Sure. So, if I can, when they were working solely with Ms. Karahito and not going to bring in anybody else, Ms. Karahito testified that of all of the fees that came into Platinum One Financial where she was working, she earned about 90% of those fees for herself. And then she testified that she split that fee on the landing field with one of the other co-conspirators, Ms. Longerbone, but never identified that Mr. Giovanni knew that or was any part of that. But the money that she earned was all of the money from the fees accumulated for Platinum One Financial running the mortgage. Okay. So, just to make sure I understand, the idea would be if she worked with these other banks, I guess, that she would still get the same amount of fees even though it wasn't with Platinum One Financial, her employer? Yes. And I think he was pointing her to some other people that were closing deals very quickly in this project. And I think the idea was that if they brought in other people, then she wouldn't be the one making all of the money. Okay. The reason I was asking is because I noticed that, for the most part, these individuals who are listed on this email have much lower down payment requirements. So, it wasn't clear to me whether he was working with them or whether he was directing her to them just because the down payments were lower. Do you understand what I'm saying? So, yes, Your Honor. When Ms. Caracito testified, she said that it was her understanding that he just wanted her to work with those people because they were being able to get deals closed and they were able to do them fast. And I think that's part of what led to one of her other emails where she's kind of venting that she's good at what she does, she's professional at what she does, and nobody can do what she does better because she's kind of offended that he is talking about bringing in other people or some of these files should go to other people. And there is an email where one of the files did get sent to another woman that Tina or Ms. Caracito had had, which was they called the woman Gina, and that she says, yes, that file has gone over to Gina. Can I ask, so tell me specifically what elements that were not, that were, where the evidence was insufficient for the conspiracy and for the aiding and abetting. So there's elements as to each that must be proven beyond a reasonable doubt. For sufficiency purposes, there has to be some evidence from which a jury can make reasonable inferences. Which of those elements were not met as to each of the charges here? Correct. So on the conspiracy, they had to prove that two or more persons agreed to commit a common and lawful plan as alleged in the indictment, that Mr. Giovanni knew of that plan and that he knowingly and voluntarily participated in that agreement. So they failed to prove that Mr. Giovanni knew of the conspiracy and that he voluntarily agreed to participate in it. Ms. Caracito testified that while she committed all of this fraud, that Mr. Giovanni did not know that and that he did not ask for it. When you say knows the conspiracy, what are you talking about? Because it's clear that a conspirator does not need to know each particular part of the conspiracy, right? Correct. So the nature of the conspiracy as alleged in the indictment is that there were these incentive payments that were being made and that they were intentionally not being disclosed to the bank so that the lenders would authorize mortgages that otherwise might not have been authorized. Ms. Caracito, all of the evidence that the government put on at trial showed that the only person that was responsible and that did... Counsel, two-minute warning. ...submit information to the bank was Ms. Caracito. The government's bank witnesses and Ms. Caracito all said that the real... Okay. So I understand. So let me fast forward a little bit. With the government, I understand their response is that there are two things that I think and there may be more that they can say, but there are two inferences that can be drawn from the evidence. One is that the defendant was a mortgage broker and as a mortgage broker, he would have understood that the documents, the information that he was giving to Ms. Caracito, which did not disclose the payments, at least in the contract, was being passed on to the bank. And the second is that at least in some instances, he personally received the HUD and the HUD would have indicated that the bank was not being told about the incentive payments. Why can't two of those facts be reasonable inferences for his knowledge of the general nature and scope and object of the conspiracy? Yes, Your Honor. So initially, Ms. Caracito testified that she received all of the contracts from Ms. Longerbone, not from Mr. Giovanni. Nobody ever testified that Mr. Giovanni saw the contracts. Assume with me for the moment that I think that there is evidence that he was at least involved in the preparation of those contracts. Assume that for the moment. So with that, I mean, if he saw the contracts, the contracts alone don't demonstrate that the incentives are not being disclosed to the bank. The bank witnesses, both bank witnesses and Ms. Caracito testified that that would have been on the form 103, which is the only form that indicates where the down payment funds came from. And that's the application? You're talking about the mortgage application? Yes. Yes. Right. So you're saying, unless, focus on those two pieces of evidence that I think the government identifies. As to those two pieces of evidence, why do they not create the reasonable inference that he knew that Caracito was telling the bank or was not disclosing those incentive payments to the bank? Ms. Caracito says that he didn't know that. She testified to that with immunity. Yeah, but that's not, that's good evidence for your client, but that's not, for, what I'm saying is there is those two pieces that I mentioned, or the government mentioned, why can't the jury infer from those two pieces, I guess is what I'm asking. So, Your Honor, my answer to that is that the bank type, there were two bank witnesses that testified. Judge Rosenbaum, is it okay if I get an answer to that? Yes, of course. Yes. And this is Judge Carnes, I'm going to want to ask a couple of questions too. That's absolutely fine. Thank you, Your Honor. With the contract, the bank witnesses testified that the incentive is not always disclosed in the contract. One of their government's witnesses testified that the incentive would typically be disclosed in an addendum to the contract. So even if Mr. Giovanni did write the contract, the bank witness testified that it's usually not in the contract, but in an addendum to it. And additionally, the bank witnesses and Ms. Caritito testified that although Mr. Giovanni was sent the HUD, that the HUD would not have disclosed that information in any normal circumstance. All right. Ms. Yar, this is Judge Julie Carnes. Can we not infer from the fact that not only was the incentive payment mentioned in the purchase agreement or even in the addendum, which seems odd, leaving aside a bank, just so that the obligations Wendemere and the defendant had with the purchaser would be cleared, nothing, nothing in writing, very informal. Could the jury not infer along the lines of what Judge Lux said that from this apparent stealth by your client, an elaborate machination, for example, in the Bradford closing, where the incentive money sent to Del Gucci's husband's tax attorney sends it to Del Gucci, who sends it to Bradford, could a jury not reasonably infer that all that stealth was accomplished by your defendant for the sole purpose of ensuring that the bank did not know about these incentive payments? I don't believe so, Your Honor. Mr. Giovanni sent out the notices of this incentive in what the government referred to as email blast, where he sent the notices that he was offering this incentive to a lot of people at the same time, and he asked those people to forward it to other people and that he would reward them for their referrals. He never sought to conceal the fact that he was offering and providing this incentive. He sent it to the broker. He sent it to many people. It was never anything that he was trying to do secretively or conceal. But this Bradford closing was awfully peculiar. What would be the reason for doing that other than to try to make sure his fingerprints aren't on the incentive payments? So when Ms. Perfeno or Ms. DelGaduce, she went by both names during this case, testified because she was the one that handled those transfers, she said that it was all innocuous that they just did that because they wanted to do it carefully and through an attorney. Through a tax attorney that had nothing to do with anything. All right. But could the jury also consider in addition to all this the fact that the defendant had a great financial incentive here? He has purchased the original note. He's in the hole for, what, half a million dollars on these particular notes. The market is cratering. And he has a great incentive to make these deals go through. And I think you don't dispute the fact that if the bank knew about these incentives, that is that the borrower is not paying any down payment, there would have been no loan. Could the jury not also factor in his strong financial interest? And in fact, an email would suggest a little desperation or concern on his part that these things get moving. Is that not a factor the jury could also consider in terms of determining his motivation and his knowledge of these transactions? Yes, Your Honor. We don't dispute that the bank testified that they wouldn't have made these loans had they known about the incentives. That said, the government never put on evidence that Mr. Giovanni did own the first mortgages. They argue in their brief that the jury could infer that he owned the first mortgage. Well, I thought all the payoffs, all the payoffs were going to Windermere. Obviously, somebody thought they owned the first mortgage. So Windermere owned essentially a lien. And there was about half of the payment went to Windermere and another half went somewhere else. No, it was all due to Windermere, as I read the record. But the defendant gave instructions that half of what was due to Windermere could go to some other fellow. And while this is not in the trial record, I believe during the aborted plea agreement, the defendant suggested the reason he was shuffling half of it to this other person was because that person had put up some credit for him, the defendant, through Windermere to purchase the original loans. Yeah, I don't dispute, Your Honor, that he had a financial incentive. But again, it was never something that he hid or disclosed from any of the parties. Those are my questions. Thank you. Thank you, Your Honor. All right. Thank you, counsel. And you have reserved five minutes to rebuttal.  Good morning, Your Honor. Good morning, Your Honors. And may it please the Court. Holly Gershaw on behalf of the United States. Starting with the sufficiency argument, at the sentencing hearing, Judge Dalton, who presided over the trial, said this to Giovanni. Based on the testimony, it was clear to me that you used your knowledge and experience as a real estate broker. You knew full well that it was against the law to misrepresent the circumstances of the buyer's financial conditions to lending institutions in order to induce them to make the loan. Counsel, this is Robert Luck. Is it reasonable for a juror, without any evidence of understanding what a mortgage broker does, to know that a mortgage broker would be passing along the information from the contract, not disclosing the incentive, and telling the bank in documents that the defendant did not see, and it doesn't appear to be looped in on, without disclosing that information? I think that it is reasonable for the juror to infer from the fact that he was a licensed real estate broker that he had knowledge about how the real estate market worked. And I think that the emails that were introduced at trial show that he was aware of bank underwriting standards, and generally that these loans would not close if the banks knew that the incentives were... Where do you get that from, Counsel? This is Robin Rosenbaum. Where do you get that from, that last half of what you said, which is that the emails show that he knew that the banks would not close on these loans if they knew that the money came from him? So, Exhibit 508 is a June 23rd email from Giovanni DeCarosito, and he sets forth the underwriting standards of the various banks, and in one place he notes that the loan to value of one is 95% minus 5% for a declining market. DeCarosito writes back that they are maxed out at 80% loan to value for investment properties. That means that they had to put 20% down of their own money in order to get these loans. Nonetheless, after that, Giovanni and DeCarosito closed on two more loans to April Fontaine where it was an 80% loan to value ratio, meaning that she... But if the burden... I'm sorry. Go ahead, Robert. I apologize. We may have the same question, which is that if the burden on you is to show that he had knowledge of the nature of the conspiracy, and here the allegations are, the indictment says, and that was given to the jury, that the nature of the conspiracy is that false statements were being made to the bank, how does that show that he knew that it was an 80-20 split, that the incentive payments were not being disclosed to the bank? That's the piece that I'm missing. Where is there that inference other than he was a licensed real estate agent and would know that he would have to do that? I get that he would know that that would have to be done. How did he know that it wasn't actually being done? Because the loans closed. And if he knew that it had to be done, that it had to be 20% of the buyer's money down, and the incentives were being used for the down payment, then that wouldn't be putting 20% of her own money down, and then the loans closed. So you have to... Counsel, I'm sorry. I understand what you're saying. And I think that if there had been evidence that what it means to be a licensed real estate broker, you know, what you have to pass and what everybody's taught and how it's impossible for a licensed real estate broker to believe that a loan could close without any payment by the alleged buyer, I guess, if the bank were aware of that, then I think you would be totally right. The problem is that I've got kind of a disconnect because I don't see the evidence in the record that, you know, as to what it means to be a licensed real estate broker and that it necessarily means in order to become a licensed real estate broker that you know that a bank will not sign off on a loan where the down payment is paid entirely by other funds than the buyers. You know what I mean? I mean, so there was evidence. Well, one of the bank custodians testified that, you know, there has to be skin in the game. And I think that that's a pretty basic common understanding about how any kind of financing works. Like, why was the bank loan 100% of the... 80% of the loan... Everything you're saying makes perfect sense. I understand completely that there has to be skin in the game. And I'm sure he understood, but the problem is I don't know where the evidence is that would indicate that he understood that. In other words... Okay. You know what I'm saying? Yes. Let me talk about some of the other evidence. And I think that Judge Carnes, you alluded to this, that the way that the incentives were being paid showed that Giovanni was trying to hide the payments from the bank, indicating that he knew that they hadn't been disclosed and that they couldn't... And you look at Exhibit 304. That's a check for $47,000 to April Fontaine from Real Estate Park, Giovanni's company. The memo line says, Haley Sell. But the money was used for the cash to close for Unit 10-103. And why in the memo line, Haley Sell, instead of money for Unit 10-103, that showed he was hiding what was going on here. Also, as you recognize with the Bradford loans, Windermere was wiring the funds from the cash to close to the borrowers through intermediaries. Giovanni was involved in this process. For example, when Tarasino told Giovanni in Longerbone that the money from one of Bradford's closings had to be turned around and sent back to him for the next closing, he said, no problem. Just let me know when they're closing. That's Exhibit 507. Exhibit 524 is Tarasino sending the HUD ones to Giovanni, saying, Chris, here are the HUD ones for your closing. So that is further evidence. And also, as you alluded to, he stood to profit from these loans. And that, in and of itself, can prove knowledge of the... I'm sorry. That's okay. So you just referred to the sending of the HUD ones. When I first looked at that, I thought, oh, yeah, that might show it. But then I looked at the HUD ones, and I mean, I don't... What is the line on the HUD ones that you would point to, or the lines or anything on the HUD ones, that would necessarily allow somebody reading them to know that the money for the down payment did not come from the buyer? Well, it's in slide 304, where it says the amount that the borrower is bringing to settlement. And, yes, technically, it must be paid from the borrower's account. But only because it was wired through these intermediaries or given to them shortly before closing. Had Giovanni not intended to hide that, he could have sent it straight to the settlement. And it goes back to the point that my friend made, which is she says, oh, but Delgridis provided an explanation for that, saying, well, they didn't trust the borrowers, and, therefore, that's why it had to go through all those various intermediaries, which makes no sense. Because if he didn't trust the borrowers, he could have just sent the money straight to the settlement. Council, this is Robert Love. I have a more fundamental question, which is that even if the HUD can be seen as a misrepresentation of an issue that Judge Rosenbaum identified, how is he to know that the HUD-1 goes to or was part of what was said to the bank or was given to the bank? Because I read the entire HUD-1 that's connected to or attached to Exhibit 524, and it doesn't say anything about it being given to the bank. It talks about it going to the settlement agent so that he can get the funds, and it may be seen as a misrepresentation to the settlement agent. But the conspiracy, what's charged here is a false representation to the bank. Where is the evidence that he knew that these representations, even if he knew about them, were going to the bank? The representation in the HUD-1 or the representations generally? Any of them. Any misrepresentations. The evidence that the misrepresentations were going to the bank was the fact that he was acting in a manner to hide where the funds were coming from, indicating that he knew that it hadn't been disclosed to the bank. Because the settlement agent is the agent on behalf of the bank and the buyer. And so this is his efforts to hide where the money has come from so that the bank won't find out. And that shows that he knows that the bank would not close on the loan if the HUD-1 it said, which one of the bank witnesses testified that the HUD-1, something that the bank does, that the numbers in the HUD-1 have to match what are given to them from the bank. Where is that testimony that he knew that the HUD-1 was going to the bank? I think that there is not testimony of that. But I think that that goes back to the jurors using their common sense that a real estate agent would know that. That goes back to the issue that Judge Rosenbaum identified, which is that there is no testimony about what the duties, the normal duties and the normal understanding of what a licensed real estate agent would be, right? Yes. But let me talk more about his involvement in these loans. In addition to the testimony that he was a licensed real estate broker by Teresito, Del Gris has testified that he's acting as a real estate broker for the developer at the landing. He signs his email as a broker owner. And then he sends an email from the Exhibit 525, which is an email where he says he's writing the contract for the landing. Attached to that email, there's a spreadsheet with available inventory. And the spreadsheet is a little bit hard to read because you know how spreadsheets, when they print out, don't print it out exactly right. But if you match everything up, what it shows is that he was the realtor for the listed condos, for many of the listed condos on that sheet, including all of four of Bradford's and one of Fontaine's that were an issue in this case. There's further testimony that Giovanni and Andre were network and selling units there that were being converted into condos. He was in a partnership with the developer, seller of the landing. He was also acting as a real estate broker. He worked together on the transactions at the landing. He was selling units at the landing with the developer. He wrote the email, Exhibit 525, we are only writing contracts on the landing property right now. He took this active role in getting the loans closed. He was emailing Teresita and saying, you can work with this broker, you can work with that broker. He financially profited from the loans that he took from the scheme and he took steps from those schemes. And there's people that says that the fact that somebody profited from it is strong evidence. The fact that somebody took steps and further is evidence. So when you look at all of this evidence in the totality of the circumstances, there's sufficient evidence. You cannot say that no reasonable juror has not found him guilty beyond a reasonable doubt. Council, for me at least, the issue that there was no evidence presented regarding the sentencing, that it was just a spreadsheet that was proffered. It was just a spreadsheet that was proffered, Your Honor, but there was never an objection to that particular ground. The objection was always that the loss amount was not being properly calculated because it didn't take into account the payment to the borrowers. And if you look back, so the PSR came out January 24, 2019. Wasn't there an objection to the PSR paragraph calculating the loss amount? There was an objection. And once that happens, isn't then the government's burden to present at least some reliable evidence in support of the loss amount once that objection is made? Yes, and the United States presented that chart. And at that point, if defense counsel had an objection to that specific and reliable nature, in other words, that the court couldn't consider that fact, it had a duty to make that objection. The United States has the burden to prove a defendant's skill at trial beyond a reasonable doubt. The United States did that entirely with hearsay evidence, and the only objection that the defendant made at trial was a Rule 29 motion that the evidence wasn't sufficient. And then on appeal said, we honor all this evidence shouldn't have been considered because it's hearsay. That would be reviewed for plain error because that was not the case. Well, we're not discussing that, though. I'm looking at the PSR addendum and describing the objection by the defendant. Paragraph one, this is a docket entry 128 of page 22, says, the defendant objects to the factual accuracy of the information contained in the offense conduct. This includes the defendant's role in the offense, the role of the co-defendant and co-conspirators, and the loss amounts. At that point, doesn't it then shift to the government to present some evidence by preponderance in support of its loss calculation? Yes, and statements by counsel, the guidelines commentary say that sometimes statements by counsel can be used to resolve a disputed sentencing. And so this sentencing chart was interviewed by the... Not alone. Not alone. What case do we have that says that counsel's statements alone, where there's an objection to that, is sufficient? It's not the counsel's statements alone. It is the chart that showed specifically where all of this evidence was coming from, what documents... But you can see it in the brief that not all of that evidence was admitted to trial. There was some things that the chart relied on that was simply not in evidence, right? Yes, and in Suffrent, the court said the same thing where there was some of the evidence was introduced... Counsel's argument has expired. It was the appraisals had not been introduced into evidence, and the court said, although it would have been better if the appraisals had been introduced into evidence, that it was sufficient, that the defense counsel had never objected to the accuracy of the appraisals or offered their own appraisals, and so they said the district court had not clearly erred in calculating the loss amount. All right. Thank you, counsel. Thank you. Are there any other questions from the rest of the panel? No. Judge Luck? No. No, thank you. Then... Thank you. Thank you. And, Ms. Yard, you have five minutes of rebuttal time left. Let me... Before you start, let me start by asking you about this Exhibit 304 of the April Fontaine check, which in the memo says, Haley Call. Can you explain why it says that? Yes, Your Honor. April Fontaine was... Is the mother of Gio Giovanni's child, Haley Fontaine, and that check was given about a month before the purchase of the condo, and I believe that the notation was that it was partially for the child's college, not so. So if we could... That's not accurate, is it? That's not accurate. It was actual... That was not the purpose of the check, right? This is Judge Garns. There is no testimony about that. Well, let me ask you this. If we compare the amount of the closing cost to the amount of the check, are we going to find that they are the same or almost the same? I am referring to April Fontaine. So her down payment on one unit was around $25,000, and another was around $24,000, and the last was around $12,000. And if I can just respond quickly, and then I will go back to the judgment of the court of the government, cited this Dufrant case as allowing them to use just a chart in which it's not supported by evidence and has been... All of the contents to have been objected to, but in Dufrant, an IRS agent did testify at sentencing. So when the court was saying it would have been better to have the documents, they were saying that in addition to the IRS agent's testimony. The incentives that Mr. Giovanni was offering were not illegal. It was not illegal to give the incentives. It was just illegal to hide them from the bank. It wasn't illegal to turn the money around once he got paid into funding the next unit. The government, as the court noted at trial, alleges in the incitement and throughout a lot of things that were not illegal. What's important to focus on here is that they didn't prove that he had the knowledge and voluntary agreement to participate in a conspiracy to hide what was the alleged illegal conduct and the purpose of the conspiracy. And the only person that they proved was a part of that, according to even her own testimony, and all of the other witnesses, was a mortgage broker. Mr. Giovanni was not a mortgage broker. That's why he hired one. He did not have the knowledge of what mortgage brokers do. Moreover, they never proved to the jury what real estate brokers do. And the government is alleging that he's listed as a real estate broker here, but the testimony at trial was that he was not acting as a real estate agent here. He was just working with a developer. Citibank was the realtor in this case. Citibank was paid as the realtor in this case. That's not actually totally accurate. They were paid $800, which suggests they handled some forms and administrative fees. It doesn't sound like the usual 6% broker commission that a real estate agent gets. Are my numbers right? I don't know how much Citibank was paid, but I don't believe there was any dispute that they were the listed realtor and that any realtor fees that were paid were paid only to Citibank. Mr. Giovanni's only interest in this was the lien that was held. And with that, Mr. Giovanni never said he was writing the contract. That's not totally accurate. As I understand it, the mortgage broker was kicking back half of her commission that she's getting from the banks to defendant's common law wife, the hairdresser. And I guess your argument on that would be, well, that's not him. It's his hairdresser wife that was getting that. So we can't tag him with that because she's the one getting that kickback. I assume that would be your argument. That is my argument, Your Honor. She was an indicted co-conspirator. But while they may have proven that tie from the mortgage broker to the hairdresser, for lack of a better term, never tied that up to Mr. Giovanni having any knowledge. The government inferred that it's a fair inference that because she was a hairdresser, Mr. Giovanni must have known what she was doing. But I would argue that it is not a fair inference to say that just because she's a hairdresser that it can't be assumed that they can do something on their own other than hair. But let me ask you, Ms. Yard. I mean, is it not reasonable for the jury to infer she's a hairdresser, he's a broker. Okay, maybe we don't know everything a broker should know, but we know he should probably know more about this at least than her. But that he also has this incentive. Again, he's on the hook for half a million dollars. The market is cratering. His emails indicate he's sort of desperate to unload these properties. Can we not infer a minimum amount of curiosity on his part to be reading these documents, to be making sure that everything in them is right? Or it's just, I don't care, somebody, there's some divine creator out there is looking after me, but I don't have to read anything. Everything will work out. Can't the jury assume from both his knowledge, his experience, what he does for a living, and his financial incentive that he shows a little more curiosity at looking at these documents and being aware of what's going on than you would suggest? Your Honor, with all respect, I don't believe it's necessary. Counsel, your argument has expired. Could she finish, please? Yes, of course. Thank you. Thank you, Your Honor. Jessica Giovanni is a professional that has a job in these transactions. Ms. Carasita, the mortgage broker, is a different professional that has a different job and responsibility and fiduciary responsibility in these transactions. Ms. Longerbone is a member of Windermere Financial that has her own responsibility. She wouldn't have a partner if he was just responsible for her. She wasn't an intern. She wasn't a student. She worked there. She was listed as a partner in that business. I don't think it's fair to assume that he's overlooking what all of these other professionals are doing to infer that he had the guilty knowledge whenever he had his own responsibility in these transactions. I would ask that the case be reversed. Thank you, Your Honor. Thank you, Counsel.